DISTRICT OF OREGON, ss:        AFFIDAVIT OF ABRAHAM SMITH

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Abraham Smith, being duly sworn, do hereby depose and state as follows:

**<u>Introduction and Agent Background</u>**

1.    I am a Special Agent with the Internal Revenue Service-Criminal Investigation (IRS-CI) and have been so employed since August 2004. I am currently assigned to the Seattle, Washington field office, Vancouver, Washington post of duty. I graduated from Brigham Young University in Provo, Utah, with a Bachelor of Science Degree in Finance, and from Western Illinois University with a Masters of Accountancy Degree. In February 2005, I graduated from the Federal Law Enforcement Training Center, IRS-CI Special Agent Basic Training Program. Since joining IRS-CI, I have conducted or been involved in numerous investigations concerning violations of Title 26 (income tax), Title 18 (conspiracy, fraud, and money laundering), and Title 31 (Bank Secrecy Act) by individuals involved in both legal and illegal occupations. I have written multiple affidavits for search warrants as well as participated in the execution of numerous federal search warrants involving tax, fraud, and money laundering violations.

2.    I submit this affidavit in support of a criminal complaint and an arrest warrant for David Aaron Shelofsky (Shelofsky) for wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1957.

3.    As set forth below, there is probable cause to believe, and I do believe, that Shelofsky has devised a scheme to defraud and has obtained money by means of fraudulent representations and has engaged in illegal monetary transactions with the proceeds, and as such, has committed wire fraud and money laundering in violation of 18 U.S.C. §§ 1343 and 1957.

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.  The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

**Applicable Law**

5.     Title 18 U.S.C. § 1343 (wire fraud) provides, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce. . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

6.     Title 18 U.S.C. § 1957 (money laundering) provides, in relevant part: "Whoever, knowingly engages in or attempts to engage in a "monetary transaction" in criminally derived property of a value greater than $10,000 and is derived with proceeds from a "specified unlawful activity", shall be fined under this title or imprisoned not more than 10 years, or both."  (Note: According to 18 U.S.C. §§ 1956(c)(7) and 1961(1), wire fraud qualifies as a "specified unlawful activity").

/ / /

/ / /

### Statement of Probable Cause

#### Background

7. This affidavit is put forth with the belief that probable cause exists that David Aaron Shelofsky (Shelofsky) committed acts of fraud against the parties identified below through violations of wire fraud and money laundering, resulting in the loss of more than $2 million as detailed below.

8. In each instance, victims loaned Shelofsky money which he promised to pay back within short periods of time and were given what they were told was security for their loans. To date, none of the loans have been paid back and the security initially promised has not been provided or could ever be provided.

9. The representations made by Shelofsky about his ability to repay them, and more importantly, the security he had to offer them for their loans were material to the victims.

10. In actuality, Shelofsky had neither the ability nor the intention to pay the victims back as he had promised, nor was he able to provide collateral for the loans as he had represented.

11. When asked if they would have made loans to Shelofsky had they known his true financial standing and his inability to provide security for their loans, each party indicated that they would not have.

#### Brian Delamarter and 3396 Group LLC

12. On January 26, 2017, Shelofsky signed an Operating Agreement with Brian Delamarter (Delamarter) of 3396 Group LLC (3396 Group), to create a new entity called Madison 8 LLC (Madison 8). The two members of Madison 8 were 3396 Group and Shelofsky.

13. The purpose of Madison 8 was to "manage certain financial transactions related to the development of 8 residential building lots in the Madison Phase 5 subdivision in Bend, Oregon…" Delamarter told law enforcement that 3396 Group agreed to provide all of the financing to purchase the lots and Shelofsky was to manage the day-to-day affairs of Madison 8 to prepare the lots for development and their eventual sale.

14. According to the Operating Agreement, Shelofsky held a 40% interest in Madison 8, and 3396 Group a 60% interest. After the financial obligations of Madison 8 had been paid, all proceeds from the sale of the eight lots in Bend, Oregon were to be paid as follows: "[f]irst, to 3396 Group LLC until it has received an amount equal to all of its capital contributions plus 8% per annum… Thereafter, 60% to 3396 Group LLC and 40% to David Shelofsky."

15. On March 2, 2017, consistent with the agreement between Shelofsky and 3396 Group, a wire for $670,938.64 was sent from a bank account in Beverly Hills, CA for the "Delamarter Family" to an account controlled by Shelofsky at Bank of America called "Rosemont Properties LLC" in Lake Oswego, Oregon. The remaining balance had been wired previously in a separate wire made on behalf of 3396 Group.

16. The next day, on March 3, 2017, the money received from Delamarter was sent from Rosemont Properties to AmeriTitle to purchase the eight lots in Bend, Oregon. In total, Madison 8 purchased the lots for $692,000 on or about March 3, 2017.

17. Beginning October 10, 2017, months after they were purchased, and through June 7, 2019, all eight lots were sold separately by Shelofsky and without Delamarter or 3396 Group's knowledge or consent. During this time, rather than inform him about the sale of the lots, Shelofsky instead told Delamarter that the lots were not selling due to complications he was

having regarding the HOA covenants and an individual responsible for overseeing the approval of the development.

18.     The total proceeds Shelofsky received for all eight lots was $738,795.94. Of this amount, no money was ever paid to Delamarter or to 3396 Group as required in the Madison 8 Operating Agreement. Instead, $247,937.63 was distributed to a JP Morgan Chase account controlled by Shelofsky and in the name Toda, LLC (Toda), $373,857.30 was used to pay back a personal loan of Shelofsky's, and another $18,960.30 was transferred to a personal bank account of Shelofsky's at Clackamas Community Federal Credit Union.

19.     According to the Oregon Secretary of State website, Toda is an Oregon limited liability corporation whose sole manager is Shelofsky's assistant, Melissa Muzzy (Muzzy).

20.     I have also reviewed the bank account for Toda at JPMorgan Chase Bank and know that the only person who has signature authority on the account is Muzzy. All checks written, cashier's checks purchased, account transfers, and wires appear to be made by her. Based on my investigation, the disbursements from this account and made by Muzzy are at the direction of and for the benefit of Shelofsky or Muzzy.

21.     In total, the proceeds distributed to Shelofsky or for his benefit from the sale of the eight lots in Bend, Oregon equals $640,755.23.

22.     The loss to Delamarter and 3396 Group LLC is $670,938.64 for the amount contributed to Madison 8 LLC for the purchase of the Bend, Oregon residential lots, plus an uncalculated amount of accrued interest.

23.     In my review of the Toda bank account held at JPMorgan Chase, I know that monies distributed to Shelofsky from the residential lots in Bend, Oregon, were used for two

subsequent transactions, each in excess of $10,000, and in violation of 18 U.S.C. § 1957—Money Laundering; monetary transactions.

24. On April 12, 2019, proceeds from the sale of one of the Bend lots were wired to Toda for $77,173.71 from AmeriTitle in Bend, Oregon. The beginning balance in the account at the time of the wire was $3,435.14. One additional deposit was made that day for $13,000 for an unrelated matter. No additional deposits were made into the account until April 24, 2019.

25. Using money from the $77,173.71 wire from AmeriTitle, an intrabank transfer was made from Toda to account X2367 held by Muzzy for $39,000 on April 16, 2019.

26. On June 7, 2019, proceeds from the sale of one of the Bend lots was wired to Toda for $71,837.85 from AmeriTitle in Bend, Oregon. The beginning balance in the Toda account on the day of the wire was -$9,207.90 (a negative balance). No additional deposits were made into the account until June 18, 2019.

27. Using money from the $71,837.85 wire from AmeriTitle, a cashier's check was purchased for Shelofsky on June 7, 2019, for $18,500.

**Robert Richardson**

28. On June 15, 2018, Robert Richardson (Richardson) wired $400,000 from his account at Bank of the West to Toda.

29. Richardson told law enforcement that prior to wiring the money to Toda, he met with Shelofsky and Muzzy, in front of a branch of Bank of the West located in SE Portland, Oregon to review and receive a loan agreement signed by Shelofsky on behalf of Toda.

30. The loan agreement promised to pay Richardson $1.25 million by December 1, 2018, less than six months later. The amount included: a $250,000 loan made by Richardson

previously to Shelofsky's attorney, Brad Baker (Baker), in March 2017, which was not timely paid back to Richardson; the $400,000 loan being made that day; and an additional $600,000 in interest.

32. At that meeting, Shelofsky told Richardson he would secure the new $650,000 loan with deeds to property he owned in West Linn, Oregon near where Shelofsky lived that were being subdivided into separate lots and that Richardson would be repaid from the sale proceeds of these lots.

32. Despite several requests since that meeting, Richardson has yet to receive the deeds to the land Shelofsky allegedly owns in West Linn, Oregon.

33. In the following texts message exchanges between Richardson and Shelofsky provided to federal law enforcement agents by Richardson, evidence exists that Shelofsky has continued to lull Richardson into believing that Shelofsky owns the West Linn, Oregon lots, that a sale of those lots is in the process of closing, and that Richardson will be paid back:

April 15, 2020

- Richardson (**RR**): *And???*

- Shelofsky (DS): *It's going. Definitely have the right buyer! I hope to have it wrapped up by the 21/22 of this month. City offices are completely closed down, so the buyer wanted to close AFTER they reopened. I've talked him into a split close, (3 lots this month and 3 lots in June).*
  *I'd give you everything (minus some permit and engineering bills) on the first closing.*
  *Not sure what if anything else I can do.*

Page 7- Affidavit of Abraham Smith                                      USAO Version Rev. April 2018

>  *I really don't want to say anything until it is done.*

<u>April 22, 2020</u>

- DS:  *I'm still hopeful that we are closing lots 1-3 today/tomorrow.*

<u>April 30, 2020</u>

- DS:  *Hope you are doing well.*

- RR:  *Chemo this morning…*

- DS:  *Praying for you.*

<u>May 2, 2020</u>

- RR:  *Don't stop praying.  Especially the money part. Chemo day!  Gives me time to think about how you've taken advantage of me for several years now.  What a fool I've been.*

- DS:  *I'm sorry you feel that way.  I feel like I've failed you too!  Need city to open so I can conclude.  Buyer is in no hurry and basically holding me hostage to COVID.*

<u>May 6, 2020</u>

- RR:  *Update please?  I left two voice mails!*

- DS (with a screen shoot of a text message allegedly forwarded to him from "Nicole"):  *Good morning David, I believe Tom (Note: believed to be Tom McWeeney) is ready and willing to move forward on lots 1, 2, 3, and 6. Please have your agent send over the amended PSA (Note: known to be a "Purchase and Sales Agreement").  In addition, have your attorney draw up*

*documents pertaining to the engineering fixes on lots due to the issues with these lots.*

*Thank you, Nicole*

- DS (DS's response to "Nicole" forwarded to RR): *OK, thank you. For clarity, we can close this week on the (4) lots mentioned above?*

- DS (response from "Nicole" to DS forwarded to RR): *I believe so, may have to wait one week as Tom left on a turkey hunt early this morning, but I will check with his team to see if they can close without him.*

- DS (response back to "Nicole" forwarded to RR): *(first part of message cut off) … you how important it is that funds change hands this week as opposed to next week. My apologies if this comes out rudely, but I'm out of "next weeks".*
  *I have another offer from an out of state builder who claims he's not concerned with this engineering issue.*

- DS (response from "Nicole" forwarded to RR): *I fully understand and will press my client. Thank you.*

- DS: *Well this is encouraging. Hard to get excited when everything has been start/stop/repeat.*
  *I'll let you know ASAP!*

- RR: *Are you going to make my day??*

<u>May 11, 2020</u>

- DS: *Have not forgotten about you. Just need to be 100% certain this time.*

**Page 9- Affidavit of Abraham Smith**              USAO Version Rev. April 2018

- RR: *Sure.*

May 13, 2020

- RR: *SURE!! Just in case you didn't get the sarcasm yesterday, as I sat in chemo all day, and you sat on my money all day.*

  *Thanks, RR*

- DS: *I got it. I know you. Once we square up, you can buy me lunch with masks on.*

- RR: *Tough to eat with a mask. Hope to get money back before that! I don't believe you could have found a sucker like me, that just happened to be greedy like me, and as lenient as me, anywhere in the area.*

- DS: *You have granted grace to a guy who ran into a significant span of shitty luck! I too am granting grace to those who owe me. It will all work out. I'm not going anywhere and won't fail here.*

- RR: *But when??? I am running out of time...*

- DS: *...As soon as one of these real estate clowns pays me, I'm paying you. Hoping it's one shot, in full. I'm not giving the date until it's funded. I gave Nic's (Note: presumed to be the "Nicole" mentioned above) group until next Monday. I can grab their EM (Note: presumed to mean "earnest money") Friday if I want to be an ass. That's $80k. Backup offer is all cash, 20 day close, $130k less but strong. I don't think I'll have debt with you before the end of the month. But I'm keeping my mouth shut until it's done. Off to chemo. Praying for you often.*

- RR: *Chicken feed. Nothing like you said.*

- DS: *Are you referring to them closing on 4 lots not 2 lots in June? They rejected that. It was my idea and they said no.*

- RR: *I'm referring to you paying me in full like you said. When did all this get moved to June? Is there no truth in you? You did warn me in advance. Guess I should have listened to you years ago. Very disappointed in my judgement at this point.*

- DS: *It didn't get moved to June. Read the text string from Nic that I sent last week. 4 lots now and 2 in June.*
  *I've never lied to you!!!*

Undated text, but in continuation of the above communication string

- RR: *Big shock today. I need all the money you can come with. Getting sick is not for poor people.*

- DS: *OK.*

- RR: *Not much of an answer.*

- DS: *I have everything tied to closing this. I am literally close to begging this guy to close. It has little to nothing to do with a little or a lot... I need it to close so I can pay you and catch up myself. We have the city agreeing to what I needed from them, now it's back in the buyer's court. If he closes part and not all, you get everything. If he closes all, we are sitting pretty. He has <u>until Thursday</u>.*

/ / /

**Page 11- Affidavit of Abraham Smith**                                   USAO Version Rev. April 2018

34. In a public records search related to properties in Clackamas County, Oregon, I know that the West Linn, Oregon lots referred to above in the text exchanges and promised by Shelofsky as collateral to Richardson are owned by a Thomas McWeeney (McWeeney). This fact was further verified by Richardson's daughter, Mindy Hill, who is a realtor in the area.

35. On May 27, 2020, I interviewed McWeeney and learned that:

- Shelofsky and McWeeney created an LLC approximately three years ago called Toda LLC. The name "Toda" was derived from his and Shelofsky's first names—Tom and David.

- The agreement between the two was that McWeeney would contribute the land and Shelofsky would have it developed and rezoned so that it could be sold as lots for residential building.

- All agreements between Shelofsky and McWeeney for development by Toda LLC (the original and all subsequent ones) have expired and are not enforceable.

- McWeeney has not spoken to Shelofsky in about a year. McWeeney has intentionally not communicated with Shelofsky because Shelofsky still owes him about $10,000 from a loan that Shelofsky promised to pay back about two years ago.

- Approximately one month ago, McWeeney spoke with the City of West Linn to find out what the development status of the land was. McWeeney learned that although an engineering plan had been submitted for the City's

consideration, presumably by Shelofsky in 2017, it has since been removed and no further actions have been taken.

- The land is no further along in being developed than when he and Shelofsky first spoke about it three years ago. In fact, the land is in an overgrown state and looks unkempt.

- Shelofsky has no ownership or other interest in the land and has no legal authority to offer the land as collateral to others.

36. In the May 18, 2020, interview with Richardson, Richardson stated that the most material reasons for his decision to loan Shelofsky money were, the collateral Shelofsky claimed he had in the West Linn lots, the amount of interest Shelofsky promised to pay him ($600,000), and that the loan would be paid in less than six months. Richardson stated that had he known any of these factors were not true, he would not have made the loan.

37. In total, the loss to Richardson to date is $650,000 comprising the $250,000 loan made to Shelofsky's attorney, Brad Baker, and the $400,000 loaned to Toda; both of which were to have been secured with the West Linn lots Shelofsky claimed he had ownership in.

38. In my review of the bank account for Toda at JPMorgan Chase Bank, I know that on the day of Richardson's deposit, June 15, 2018, the account balance was $4,979.00. No further deposits were made into the account until July 31, 2018. During this time, the entire $400,000 was spent or distributed for a variety of purposes.

39. From my review of the Toda bank accounts, I know that the following transactions in excess of $10,000 were made using the $400,000 Richardson loaned and which

are in violation of 18 U.S.C. § 1957—Money Laundering; monetary transactions: (*Note: the following do not represent all transactions in excess of $10,000 from the Richardson money.*)

- An intrabank transfer on June 15, 2019, for $93,000 to account X1969 for Gary and Melissa Muzzy.
- An intrabank transfer on June 15, 2018, for $100,000 to account X2367 for Muzzy.
- An intrabank transfer on June 16, 2018, for $35,000 to account X2367 for Muzzy.

**Jack Steinhauer & Steinhauer Family Trust**

40. On May 18, 2020, I participated in an interview with Jack Steinhauer (Steinhauer). He loaned Shelofsky money on three different occasions totaling $690,000.

41. According to Steinhauer, his decision to loan Shelofsky the money to purchase The Hill Property was based on three material factors: a very close relationship Steinhauer felt he had with Shelofsky that allowed him to trust Shelofsky, Steinhauer's loan was secured with a first mortgage position on The Hill Property which Shelofsky purchased for approximately $1.3 million, and a promissory note given to Shelofsky which pledged additional security in residential lots waiting to be sold in West Linn, Oregon (mentioned above); and as such, the loan-to-value was favorable enough to Steinhauer that he had even more confidence about making the loan.

42. Shelofsky told Steinhauer on multiple occasions that every dollar from the three loans Steinhauer gave him would be/was used for Shelofsky to purchase a property located at 455 Rosemont Road in West Linn, Oregon; generally referred to as "The Hill Property."

43. When Steinhauer made the loans to Steinhauer, Shelofsky told Steinhauer that he (Shelofsky) was using his own money to fund the remainder of the purchase price for The Hill Property which would leave Steinhauer with a first mortgage position on the property.

44. Shelofsky told Steinhauer that he was in the process of securing permanent financing for the property and only needed to borrow Steinhauer's money for about 60 days.

45. Steinhauer came to trust Shelofsky considerably and felt confident in the representations Shelofsky gave him.

46. During this same time, Steinhauer stated that he was going through one of the darkest periods of his life when he started to confide in Shelofsky. He had just lost his job of 15 years and was in the middle of a separation with his fiancée, which weighed heavy on him. Steinhauer told Shelofsky the most personal details of his life and came to consider Shelofsky a close friend.

47. Shelofsky encouraged Steinhauer to turn to religion and agreed to act as an intermediary between Steinhauer and his fiancée to try and reconcile their relationship.

48. Steinhauer and Shelofsky worked out together regularly at a facility on The Hill Property where they would also talk. Shelofsky's wife and Steinhauer's fiancée were also beginning to spend time together.

49. Public records show that Shelofsky purchased The Hill Property on July 23, 2019.

50. Steinhauer stated that he wired $390,000 directly into escrow for Shelofsky to purchase the property.

51. In addition to the $390,000 deposited into escrow for Shelofsky to purchase The Hill Property, Steinhauer also wired Shelofsky $300,000 in two separate $150,000 transactions

from a bank account for the Steinhauer Family Trust at CalWest Bank in Rancho Santa Margarita, California to Toda in Damascus, Oregon.

52. The first $150,000 wire was sent on June 28, 2019. The second was sent on July 22, 2019.

53. Shelofsky gave Steinhauer an amended promissory note dated July 22, 2019, for the total of all three loans had made totaling $690,000. The original note mistakenly identified the loan amount as only $390,000. All other terms were the same.

54. When Shelofsky was unable to secure permanent financing for The Hill Property in which to buy Steinhauer out, Shelofsky told Steinhauer that he wasn't able to qualify for traditional financing because too much of his net worth and income were wrapped up in other business ventures he was involved with. That did not worry Steinhauer because of he believed he had a first position security interest on The Hill Property and the collateral on the West Linn lots Toda supposedly owned.

55. After a period of time of non-payment on his loan, Steinhauer pressed Shelofsky for a copy of the deed granting him a first mortgage position on The Hill Property and updates regarding the sale of the West Linn lots.

56. After more time, Steinhauer became concerned about getting paid back and decided to run a preliminary deed history on The Hill Property and learned that in fact, Shelofsky did not use any of his own money to purchase The Hill Property as he had told Steinhauer, but instead secured a $900,000 loan from a hard money lender in Springfield, Oregon called Advanced Investment Corp. Because Shelofsky never formally gave or recorded a deed/lien of

Steinhauer's interest in The Hill Property, Advanced Investment Corp. currently has a first position on the property, not Steinhauer.

57. Despite several promises from Shelofsky to provide a deed to The Hill Property for the $690,000 he loaned Shelofsky, Steinhauer never received one.

58. Rather than continue to wait for Shelofsky, Steinhauer decided to initiate the process himself and had documents drafted up and signed by Shelofsky and his wife, which were filed on May 19, 2020, giving him a deed to The Hill Property.

59. In order to learn more about The Hill Property, Steinhauer acquired a full title report from Lawyer's Title of Oregon on May 27, 2020, and found out that an additional $1,108,886 in liens had also been attached to The Hill Property including: $395,680 from the Oregon Department of Revenue, $588,678 from a private party judgement against Shelofsky from 2010, and a $124,528 mechanic's lien.

60. With all the encumbrances against it, Steinhauer's deed against The Hill Property now has little-to-no value to it, especially with liens filed for back taxes from the Oregon Department of Revenue and Advanced Investment Corp's first position mortgage of $900,000 which have priority over his and which in total exceed the expected value of the property.

61. In support of his claim of ownership in the West Linn lots, which was to provide security for Steinhauer's loan, Shelofsky provided Steinhauer a copy of the Toda LLC Operating Agreement which showed Shelofsky had a 40% interest in the LLC with McWeeney. Shelofsky further represented that it was Toda that owned the West Linn lots.

/ / /

/ / /

62. As with Richardson's loan discussed above, the security promised to Steinhauer for the West Linn, Oregon lots is deemed to be worthless because neither Shelofsky nor Toda has an ownership interest in the property, only McWeeney does.

63. In my review of the Toda bank account held at JPMorgan Chase Bank, I know that on June 28, 2019, when Steinhauer wired his first $150,000 loan deposit, the beginning balance in the account was $16,521.95 and no other deposits were made into the account that day.

64. That same day, a cashier's check was purchased for $137,912 at JPMorgan Chase by Muzzy to Active Water Sports, a marine and boat dealership store located in the District of Oregon.

65. In records received from Active Water Sports, I know that the cashier's check from Toda for $137,921 was used to purchase a boat registered to RD & RD.

66. In a telephone conversation I had with RD & RD on May 28, 2020, I learned that Shelofsky bought them a boat as a gift for "everything they had done for them".

67. In my interview with Steinhauer on May 18, 2020, I asked him if he knew or had any discussions with Shelofsky about the $150,000 he wired to Toda on June 28, 2019, being used to purchase a boat. Steinhauer said they had not.

68. Around the same time Steinhauer's money was used by Shelofsky to purchase a boat for RD & RD, Shelofsky asked Steinhauer why he did not have a boat. Steinhauer told Shelofsky that he would like a boat but felt that he did not have the money for the boat he wanted and needed the money to pay for his kids' upcoming college expenses. Steinhauer would not have agreed to purchase Shelofsky a boat when he felt he could not afford one himself.

69.     Because the wire for $150,000 on June 28, 2019, from the Steinhauer Family Trust to Toda was made under fraudulent pretenses, the subsequent transaction to purchase the cashier's check for $137,912 and made payable to Active Water Sports is a violation of 18 U.S.C. § 1957—Money Laundering; monetary transactions.

70.     In total, Steinhauer's losses due to material misrepresentations made to him by Shelofsky equal $690,000, and are comprised of the $390,000 wired into escrow for Shelofsky to purchase The Hill Property, a $150,000 wire to Toda on June 28, 2019, and a $150,000 wire to Toda on July 22, 2019.

## Conclusion

71.     Based on the foregoing, I have probable cause to believe, and I do believe, that Shelofsky has committed violations of 18 U.S.C. §§ 1343 (wire fraud) and 1957 (money laundering), for which losses have been incurred by the above named parties totaling, $2,010,938.64.  I therefore request the Court issue a criminal complaint and an arrest warrant for David Aaron Shelofsky.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

72.     Prior to being submitted to the Court, this affidavit was reviewed by Assistant United States Attorney (AUSA) Michelle Kerin, and AUSA Kerin advised me that in her opinion the affidavit is legally and factually sufficient to establish probable cause to support the issuance of the requested compliant and warrant.

<u>By phone pursuant to Fed. R. Crim. P. 4.1</u>
ABRAHAM SMITH
Special Agent, IRS-Criminal Investigation

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at  3:46  p.m. on June 4, 2020.

*Youlee Yim You*
_____
HONORABLE YOULEE YIM YOU
United States Magistrate Judge